Receipt number AUSFCC-6898243

**REDACTED VERSION**

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

|  |  |  |
|---|---|---|
| VS2, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | No. \_\_\_\_21-1028 C\_\_\_\_ |
| | ) | |
| v. | ) | Judge _____ |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff, VS2, LLC (VS2), respectfully brings this action against Defendant, United States of America, acting through the United States Department of the Army, Army Contracting Command – Rock Island (the Army or the Agency), and alleges the following:

## NATURE OF THE CASE

VS2 protests the Army's adherence to the recommendations of an overreaching protest decision by the Government Accountability Office (GAO). VS2 won a task order for logistics-support services in this competition where the Solicitation provided for determining best value by selecting the lowest-price proposal that received a Substantial Confidence rating for Past Performance and Acceptable ratings under the other two non-cost/price factors. A disappointed offeror, Vectrus Mission Solutions Corporation (Vectrus), protested. Vectrus challenged upwards cost-realism adjustments to its proposal based on its initial suggestion that ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and, when that was denied, its blithe assertion that it would simply absorb the costs of ▓▓▓▓▓▓▓▓ without passing them on to the Government. While the Army believed in its discretion and—consistent with the stated

evaluation criteria—that Vectrus' proposed approach created risk and uncertainty and that the proposed credit was unrealistic, GAO substituted its judgment for that of the agency in *Vectrus Mission Solutions Corp.*, B-418492, Oct. 27, 2020 (still under protective order), holding that because Vectrus had proposed to absorb the $22 million of costs in question, the Army was required to accept that approach and prohibited from making an upwards realism adjustment to account for those costs. To do so, GAO relied on precedent that, contrary to GAO's conclusion in *Vectrus*, does not preclude an agency from upwardly adjusting proposed costs in this situation, where the solicitation cautioned against proposing unrealistic costs.

GAO compounded its irrational decision by recommending that the Army select the (newly) low-price Vectrus proposal for award. The Army did so. Nothing suggests, however, that the Army's concerns about the realism or the negative impact on Vectrus' performance of the $22 million in proposed "cost absorption" somehow were alleviated after GAO decided they weren't a problem. The result is arbitrary and capricious agency action for four related but ultimately independent reasons:

*First,* the Army took its corrective action based on a GAO decision and recommendation that were irrational. Cost realism evaluations are highly discretionary. Yet under GAO's decision in *Vectrus*, no matter how inconvenient or unwise the Army found the proposed cost absorption, or how little interest it had in negotiating terms mandating the cost absorption—much less policing Vectrus' adherence to those terms—the Army lacked discretion to decline the proposed absorption. Not only is that reasoning inconsistent with GAO precedent, it has far-reaching implications. Agency evaluators must either accept proposed cost absorptions or find the absorption so unrealistic as to warrant rejecting the proposal outright. There are no

-2-

alternatives, an unjustifiable handcuffing of contracting agencies' discretion. By accepting an irrational restriction on its evaluation judgments, and selecting Vectrus, the Army undertook corrective action arbitrarily and capriciously.

**Second,** the Army irrationally failed to consider the technical risk resulting from such Vectrus shouldering so much of the performance costs. As noted previously, the solicitation here prominently included multiple warnings against proposing unrealistically low costs. So applying GAO's own precedent, even if cost-realism adjustments were off the table, the Army was still obliged to consider the impact of the proposed absorption in its evaluation. Yet in recommending award to Vectrus, GAO failed to recognize or identify this analysis as still necessary. That omission did not relieve the Army of its obligation to consider the risk and other impacts of $22 million in cost absorption, as this remained a ground rule of the Solicitation. But the Army apparently undertook no such analysis in following GAO's recommendation.

**Third,** the Army never considered how the proposed cost absorption affected Vectrus' responsibility. Taking the GAO's *Vectrus* decision at face value, a responsibility analysis was still the bare minimum required of the Army. The analysis would have been far from routine: Vectrus had proposed to eat costs representing a noticeable share of its ultimate corporate parent's annual net income and reported cost on hand. So what effect would the cost absorption have? Not considering this question was not an option.

**Fourth**, and finally, Vectrus should not have received a past-performance rating to even have been considered for award in the first place. Vectrus has performed poorly on at least two Army contracts, including one for logistics-support services. Yet Vectrus received a Past Performance factor rating of Substantial Confidence, the highest rating available and the rating

-3-

needed to be considered for award under the circumstances. Adverse performance information about Army contracts was surely too close at hand for the Army to ignore. Vectrus should have been rated lower and, as a result, unawardable, which would have rendered any analysis of cost and pricing academic.

Whether through eliminating a well-justified realism adjustment to Vectrus' proposal—one that is firmly grounded in multiple Solicitation provisions—at GAO's behest, failing to consider the impact of cost absorption on performance and responsibility, or failing to rate Vectrus' past performance reasonably, the Army's arbitrary and capricious evaluation kept VS2 from retaining the award it had initially received.

But the prejudice to VS2 is not the only harm here. Again, the GAO's *Vectrus* decision follows GAO precedent in depriving agencies of important evaluation discretion. Not every proposal to absorb costs merits acceptance at face value. The agency effort needed to formalize and enforce such proposals may in some cases outweigh any cost savings, among other reasons proposed cost absorption might be unavailing. One very reasonable response to such a proposal is to decline the absorption, adjust costs for realism, and evaluate the proposal on even footing against competitors. GAO's *Vectrus* decision takes that tool away. This reduction in procurement flexibility should be rejected as irrational and unwise.

## JURISDICTION

1. This Court has jurisdiction over this protest under 28 U.S.C. § 1491(b)(1).

2. Although the award at issue is referred to as a "task order," it is a task order under a Basic Ordering Agreement (BOA). A BOA is not a task or delivery order contract under 10

U.S.C. § 2304a or § 2304b. Therefore, 10 U.S.C. § 2304c(e)(2) does not grant the Government Accountability Office exclusive jurisdiction over this protest.

## PARTIES

3. VS2 is a joint venture between VSE Corporation and APTIM Federal Services, LLC. VS2's principal place of business is located at 6348 Walker Lane, Alexandria, VA 22310.

4. Defendant is the United States of America, acting through the Army. The Contracting Officer for the Army responsible for this procurement is Mr. Corbin De La Cruz.

## STANDING

5. VS2 is an interested party with standing to file this action under the Tucker Act, 28 U.S.C. § 1491(b)(1). VS2 was awarded the task order under the initial evaluation. Were it not for the Agency's unreasonable decision to take corrective action, VS2 would remain the awardee.

## RELEVANT FACTUAL BACKGROUND

**Overview of the Procurement**

6. The Agency issued Request for Proposals No. W52P1J-19-R-0070 (the Solicitation or the RFP) on September 18, 2019, seeking Logistics Support Services at Fort Benning, Georgia.

7. The RFP provided that the agency would evaluate four factors: (1) Technical, (2) Past Performance, (3) Cost/Price, and (4) Small Business Participation. The RFP prescribed a best-value selection process.

8. The Technical and Small Business Participation factors were rated for acceptability only. Only Past Performance would receive a range of qualitative ratings (Substantial Confidence, etc.).

9. The RFP provided for determining best value by selecting the lowest-price proposal that received a Substantial Confidence rating for Past Performance and Acceptable ratings under the other two non-cost/price factors.

10. Relevant to the cost evaluation, the RFP required offerors to propose a minimum of 735 full-time equivalents (FTEs), but left it up to offerors to propose a labor mix appropriate for their unique technical approaches.

11. The RFP provided for a cost realism analysis, as is required for an award of a cost reimbursement contract. And the RFP warned: "Offerors are cautioned that the Government has concerns with the potential for post-award performance problems if Offerors propose unrealistically low costs":

> Offerors are cautioned that the Government has concerns with the potential for post-award performance problems if Offerors propose unrealistically low costs. Therefore, the Government reserves the option of rejecting a proposal if, in the exercise of its judgement, it determines that an Offeror's cost proposal is unrealistically low, regardless of technical merit and/or evaluated costs. The magnitude of any necessary and appropriate most probable cost (MPC) adjustments may be taken into consideration. For example, if as a result of the Cost Realism analysis it becomes clear to the Government that any necessary upward MPC adjustments are so substantial that the present an unacceptable risk (notwithstanding an assessed rating of acceptable under the technical factor), the proposal may be rejected and not further considered for award. ***Therefore, failure of the Offeror to establish the credibility of its proposed costs may result in a MPC adjustment being made to the costs proposed, and/or the proposal being rejected as unrealistically low and not further considered for award***.

12. The RFP also warned offerors that they had the burden to demonstrate the realism of their proposed costs:

> It is the Offeror's obligation to submit an unambiguous proposal that clearly reflects the Offeror's intended technical approach and establishes cost credibility. Any inconsistency, whether real or apparent, between promised performance and proposed cost must be adequately explained in the proposal. . . . Failure to adequately explain an inconsistency between promised performance and cost may result in a finding of Technical Unacceptability or a finding that a proposed cost is unrealistic for work to be performed.

13. For the Past Performance evaluation, the Solicitation required offerors to identify any past performance problems they encountered while performing recent and relevant work:

> The Offeror shall identify all recent contracts where it or its proposed JV Partners or Subcontractors experienced any performance problems that occurred within three years prior to the closing date of this RFP. For each contract identified, the Offeror shall provide copies of all Level III Corrective Action Reports (CARs), Cure Notices, Level III Nonconformance Reports (NCRs) or Show Cause letters received regardless of whether or not the contract was provided as a contract reference in the Offeror's task order proposals to date. In addition, the Offeror shall include the contract number, a brief description of the issue, the corrective actions taken to avoid recurrence of the problem, the extent to which the corrective action has been successful, a mitigation plan of how to prevent similar future issues, and Customer points of contact who can confirm the success of the corrective measures.

14. The Solicitation defined recent past performance as "any contract under which any performance, delivery, or corrective action has occurred within the following time standards: three (3) years prior to this RFP closing date [*i.e.*, Oct. 18, 2019], regardless of the award date."

15. Relevant past performance is performance on an effort that is "similar [in] scope and magnitude of effort and complexities" as the solicited effort. "In order to determine if a reference is similar in scope to the Ft. Benning Task Order, the reference must have demonstrated similar experience, to the Fort Benning PWS Attachment 0001, in at least one of

-7-

the following functional areas: § M.5.2.8(c)(1)(i) Maintenance; § M.5.2.8(c)(1)(ii) Supply; and § M.5.2.8(c)(1)(iii)." The Solicitation also specified various dollar thresholds that must be satisfied or exceeded in order to meet the "magnitude and complexity requirements."

16. The Solicitation required the Agency to assign a confidence rating to each offeror's past performance. An offeror that did not receive a rating of substantial confidence was not eligible for award.

**Evaluation and Award**

17. The Agency received nine proposals in response to the Solicitation. The Agency first evaluated proposals for compliance with Solicitation instructions and technical acceptability. Out of the nine proposals, the Agency found that three were complaint and technically acceptable and offered the lowest prices. Those three offerors—VS2, Vectrus, and Vanquish Worldwide, LLC (Vanquish)—were then evaluated under the Past Performance, Cost/Price, and Small Business Participation factors.

18. The Agency opened discussions with VS2, Vectrus, and Vanquish.

19. The ENs sent to Vectrus focused on its Cost/Price proposal. Vectrus' initial proposal included a $24.8 million discount to its proposed price that it described as a "business policy decision" to absorb ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

20. During discussions, the Agency voiced concerns with how this decision would impact Vectrus' ability to perform the work. In response to the Agency's concerns, ***Vectrus asked the Agency whether it could*** ▆▆▆▆▆▆▆▆▆▆▆▆ ***than required by the Solicitation***:

> [I]s it also an acceptable Business Policy Decision to propose to ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, with the understanding that: (1) mission support would not be negatively impacted, (2) we are basing our Business Policy Decision on

-8-



documented, historical experience providing equivalent support at Fort Bragg, and (3) should Vectrus at some point need to ▇▇▇▇ that Vectrus would bear the full cost of ▇▇▇▇?

21. The Agency responded in the negative, and reminded Vectrus that offerors were required to meet the minimum ▇▇▇ requirements of the RFP.

22. In its final proposal revision, Vectrus made minor adjustments to its proposed price in response to other ENs, but still proposed a credit for "absorbing" $22 million for the costs of ▇▇▇▇. Vectrus' final proposal stated:

> Our second Business Policy Decision involves a further cost-reduction benefit to the Government, wherein Vectrus absorbs a portion of the costs, and the associated financial risk. Our approach, rationale, and benefits to the Government are detailed below:
>
> - Approach: Vectrus will absorb the costs of ▇▇▇▇.
>   - Our subcontractors will not be involved in this Business Decision.
>   - The cost of these ▇▇▇ over the period of performance (PoP), including the 6 month option to extend, is ($22,176,308) as shown in our cost model, Vectrus_Vol_4_CostProp.xlxs file on Tab 3. Cost Element Summary, Cell U56. To absorb these costs internally, Vectrus will use our corporate proceeds.
>   - NOTE: Over the PoP, Vectrus, and our three subcontractors, will ▇▇▇▇ Our Vectrus and subcontractor cost/price models collectively reflect that all required ▇▇▇ are accounted for and ▇▇▇ IAW [in accordance with] the RFP.
> - Rationale: Vectrus is a financially sound and transparent publicly traded corporation with a strong cash position; as such, our company is fully capable of absorbing the cost of this Business Policy Decision.

- Vectrus formally acknowledges and accepts the risks and responsibilities associated with this decision.

- This decision will not impact our operational approach to managing and executing the Fort Benning Task Order (TO) PWS [performance work statement] technical requirements and achieving the associated PRS [performance requirements summary] performance standards.

• Benefits to the Government: This second Business Policy Decision provides the Government a no-risk cost savings of $22,176,308.

In summary, Vectrus has costed ▮▮▮▮▮ identified in the Technical Volume into our Cost/Price Volume. We have made a Business Policy Decision to absorb the costs of ▮▮▮▮▮, out of our corporate proceeds to provide value to the Government. Vectrus confirms that all proposed ▮▮▮▮▮ proposed in the Technical Volume are priced in the Cost/Price Volume.

23. In the final evaluation, the Agency made upward cost adjustments to Vectrus' proposed costs. The main adjustment—in the amount of $$19,719,898—was to account for the costs Vectrus proposed to absorb.[1] The Agency provided two reasons for upwardly adjusting Vectrus' costs. **First, the cost evaluator expressed concern with Vectrus' suggestion that it would** ▮▮▮▮▮, and concluded that if Vectrus did not ▮▮▮▮▮ this would pose a risk to the government. **Second, the Agency was concerned about Vectrus' ability to absorb such a significant portion of the costs**:

> Second, the Offeror's proposed cost credit for CPFF [cost plus fixed fee] CLINs [contract line item numbers] amounts to a total of $17,839,964 for the Base and OYs [option years] 1-4. The Offeror's proposed fee is ▮▮▮▮▮. Therefore, **the analyst finds the proposed credit unrealistic as it would not be covered by the Offeror's proposed fee if issues arose during execution.**

---

[1] The upward cost adjustment was smaller than the proposed absorption because it adjusted the costs for only those ▮▮▮▮▮ portion of the requirement.

-10-

24. The Agency assigned the offerors the following ratings in the final evaluation:

| Offeror | Technical | Small Business Participation | Past Performance | Evaluated Price |
|---|---|---|---|---|
| **Vectrus** | Acceptable | Acceptable | Substantial Confidence | $270,551,185 |
| **Vanquish** | Acceptable | Acceptable | Neutral | $253,582,776 |
| **VS2** | Acceptable | Acceptable | Substantial Confidence | $257,097,548 |

25. Because VS2 was the lowest priced offeror with Acceptable ratings under the Technical and Small Business Participation factors and received a Substantial Confidence rating for Past Performance, the Agency awarded the task order to VS2.

**Vectrus Protest and Decision**

26. Vectrus protested at the Government Accountability Office (GAO), arguing that the Agency had unreasonably applied an upward cost adjustment for Vectrus' plans to shoulder $17 million in ▬▬▬▬.[2] According to Vectrus, because its proposal had promised that it would not charge the cost of ▬▬▬▬, the Agency could not upwardly adjust Vectrus' evaluated costs to account for those costs.

27. The Agency, in turn, defended the evaluation by arguing that it had a reasonable concern about whether Vectrus would actually assume liability during performance given the significant portion of the costs Vectrus proposed to absorb.

---

[2] Vanquish also filed a protest at GAO, which was dismissed because GAO concluded that Vanquish was not an interested party.

-11-

28. Relying on GAO precedent, GAO held that "where a firm offers a cap or ceiling on a particular cost that limits the government's liability and shifts liability for the cost to the offeror—and no other issue calls into question the effectiveness of the cap—any upward adjustment to the capped cost is improper. . . . Any question concerning a firm's ability to perform the contract in light of a capped cost that is below the actual cost is a matter of the firm's responsibility rather than a matter to be considered by the agency in its cost realism evaluation." Importantly, the precedent GAO relied upon as support for this bright-line rule carved out an exception for situations where the solicitation cautioned offerors against proposing unrealistic costs, as the Solicitation here did. But applying the asserted bright-line rule without considering the exception, GAO held that the Agency could not adjust Vectrus' proposed costs or assign any technical risk to the proposal.

29. GAO also addressed the Agency's stated reasons for upwardly adjusting the costs. First, GAO found that the Agency "made an unwarranted assumption about what Vectrus might do during performance based on the informal—clearly non-binding—exchange with Vectrus" about Vectrus' desire to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Second, GAO concluded that the Agency unreasonably found "that Vectrus was not financially capable of absorbing the cost savings it had proposed, even though there is nothing in the record to show that the agency ever made a responsibility determination with respect to Vectrus."

30. Based on these findings, GAO sustained the protest. GAO then provided its own proposal re-evaluation, recommending that the Agency terminate VS2's task order and award the task order to Vectrus:

> As discussed, the record shows that, absent the agency's cost evaluation error, Vectrus would have been the lowest cost/price offeror, not the awardee, VS2. ***Accordingly, we recommend that the agency issue the task order to Vectrus as the apparent low-cost/price acceptable offeror with a substantial confidence rating for past performance, if otherwise proper.*** In the event the agency issues the task order to Vectrus, we further recommend that the agency terminate the task order to VS2 for the convenience of the government. Finally, we recommend that the agency reimburse Vectrus the costs associated with filing and pursuing its protest, including reasonable attorneys' fees. Vectrus should submit its certified claim for such costs, detailing the time spend and the costs incurred, directly to the agency within 60 days of receiving this decision.

**Corrective Action and VS2 Protest**

31. After GAO issued its decision, the Agency discussed potential courses of action. The Agency identified two options:

- Accept GAO's recommendation which would require:
  - Terminate the task order issued to VS2 for the convenience
  - Issue the new task order to Vectrus as the apparent low-cost/price acceptable offeror with a substantial confidence rating for past performance, if otherwise proper.
  - Request Vectrus to re-validates its proposal, determine a way to ensure (without further evaluation) that Vectrus performs to its business decision policy.
- Deny GAO's recommendation which would require:
  - Reasonable rationale as to why the GAO made the wrong decision and/or compelling reasons.
  - Sec Army must approve, with AMC Concurrence.

32. The Contracting Officer recommended that the Agency accept GAO's recommendation. "After considering all factors, USG stakeholders collectively decided to explore" accepting GAO's recommendation.

-13-

33. The Contracting Team "generated contract language to be incorporated into [the] new award to Vectrus. The purpose of this language was to hold Vectrus to its proposed business strategy and establish[] a way to track the proposed cost savings to the USG."

34. The Agency did not re-evaluate Vectrus' proposal to consider the impact of a $17 million cost absorption on Vectrus' technical approach and anticipated performance.

35. On November 10, 2020, the Army followed GAO's recommendation and terminated VS2's award for convenience.

36. On December 4, 2020, the Agency followed GAO's recommendation and awarded the task order to Vectrus. Seven days later, VS2 filed a protest at GAO challenging the corrective action.

37. VS2's protest argued, among other things, that both GAO's decision and the Agency's decision to take corrective action were flawed. VS2's protest also alleged that the Agency failed to reasonably evaluate Vectrus' past performance—a factor that could obviate the need to even consider Vectrus' proposed cost absorption in the first place.

38. Vectrus experienced significant performance problems on a task order for the Army to provide logistics support services at Fort Bragg, North Carolina. Because Vectrus failed to properly staff the Fort Bragg task order, Vectrus was unable to comply with the requirements of the task order.

39. Vectrus also performed poorly on an Army task order to provide support for the Air Force's pre-positioned war reserve material ("WRM") program. Vectrus experienced recurring scheduling issues that undermined military readiness, poor safety controls that resulted

-14-

in two deaths, and systemic cost related issues. These issues led to cure notices and corrective action reports and culminated in a partial termination of the task order.

40. On February 25, 2021, GAO dismissed VS2's protest, finding that it was an untimely request for reconsideration.

## COUNT I

### THE AGENCY'S DECISION TO TAKE CORRECTIVE ACTION BY AWARDING TO VECTRUS WAS ARBITRARY AND CAPRICIOUS

41. This count incorporates all preceding paragraphs in this Complaint.

42. The Agency's decision to take corrective action was arbitrary and capricious for four reasons.

43. *First*, the Agency took its corrective action based on a GAO decision and recommendation that were irrational. GAO's decision improperly substituted its judgment for the judgment of the Agency and then needlessly constrained the Agency's decisionmaking.

44. Agencies are provided discretion in conducting their cost realism evaluations, including in adjusting the proposed costs to the most probable cost. In its decision, GAO advanced a bright-line rule that agencies are not permitted to make most probable cost adjustments when an offeror proposes to absorb the relevant costs, regardless of the feasibility of the offer, the effort necessary to monitor and enforce it or any considerations of its potential negative impact on performance. As a result, GAO held that the Agency improperly adjusted the proposed costs and recommended that the Agency terminate the task order with VS2 and award to Vectrus.

-15-

45. But the same line of GAO precedent expressly recognizes that when an agency's solicitation warns offerors against proposing unrealistically low costs, the impact of proposed cost absorption is a matter for the agency to consider "in the context of its evaluation of proposals and source selection decision process." Barring cost-realism adjustments, as the GAO *Vectrus* decision did, removes critical discretion from the Agency's cost evaluation. Namely, GAO's holding forces contracting agencies to take as given offerors' cost-absorption proposals that, while not so unrealistic to merit proposal rejection, still present cost and/or performance risk that the evaluators find to be impracticable or unwise. Likewise, an agency might prefer not to have to negotiate terms holding offerors to proposed cost caps—much less to police those caps during performance—and instead compare offerors on a more apples-to-apples basis. GAO's bright-line rule deprives agencies of that discretion.

46. Here, the Agency in its discretion and consistent with the Solicitation's direction, appropriately was skeptical of the proposed absorption and upwardly adjusted Vectrus' most probable cost. GAO wrongly held it had no such discretion. Because the Agency took corrective action based on GAO's irrational decision, the Agency's decision to take corrective action was arbitrary and capricious.

47. ***Second***, both GAO's recommendation and the Agency's decision to take corrective action by awarding to Vectrus failed to assess the proposed cost absorption's technical risk. Again, GAO precedent expressly recognizes that when an agency's solicitation warns offerors against proposing unrealistically low costs, the agency considers cost-absorption risk "in the context of its evaluation of proposals and source selection decision process." Even though the RFP here warned against proposing unrealistically low costs, GAO failed to recommend

-16-

considering the impact in proposal evaluation, and the Agency in turn awarded to Vectrus without considering that the cost absorption proposal could impact other aspects of the evaluation. Had the Army done so, it would have identified a concern with Vectrus' ability to perform the contract at such a below-cost proposal, as it had previously done.

48. **Third,** the Army failed to evaluate Vectrus' responsibility as required by the FAR. Even setting aside the obligation to consider the technical risks, the Army still had to consider the impact of such significant cost absorption as a matter of Vectrus' responsibility. GAO noted that the Army did not perform such an analysis of Vectrus before the original award to VS2. And the scant record provided by the Army after its corrective-action decision reflects no responsibility determination, either. There is thus no evidence that the Army examined the impact on responsibility of Vectrus' absorbing around $3.5 million per year ▓▓▓▓▓ when that figure represents around 10% of its ultimate corporate parent, Vectrus, Inc.'s, annual reported net income in recent years—and, for the fiscal year completed before corrective action, around 10% of Vectrus, Inc.'s reported cash on hand.[3] *See* Vectrus, Inc. 2019 Annual Report, *available at* https://s25.q4cdn.com/572195133/files/doc_financials/2019/ar/2019-Annual-Report.pdf. These were basic considerations that the Army failed to address, rendering its corrective action arbitrary and capricious.

49. **Fourth**, the Agency's decision to take corrective action by awarding to Vectrus was arbitrary and capricious because a reasonable evaluation of Vectrus' past performance

---

[3] For the fiscal year that finished after the Army's corrective-action decision, quarterly reports during the year did show upward growth in Vectrus, Inc.'s cash on hand, but at best this growth would need to be weighed against the company's recent significant cash outflows for corporate acquisitions and the impact of any future acquisition-related large outflows.

would have kept Vectrus from being in line for award. The Solicitation required offerors to have a past performance rating of "Substantial Confidence" to be eligible for award. Vectrus was undeserving of a "Substantial Confidence" rating because it has adverse past performance on two prior task orders, including maintenance problems that led to two deaths. This information was too close at hand for the Army to ignore. A rational evaluation would have awarded Vectrus a rating of at most Satisfactory Confidence. This rational rating would have knocked Vectrus out of line for award no matter how the Army factored in the risk of Vectrus' substantial cost absorption. The unreasonable assignment to Vectrus of Satisfactory Confidence is thus an independent basis for finding the Army's corrective-action decision to be arbitrary and capricious.

50. If the Army's latest evaluation were rational, it would have either not taken corrective action or it would have evaluated Vectrus as high cost, technically unacceptable, and/or not responsible. In any of those scenarios, VS2 would have been awarded the task order, as it was originally, as the lowest-price remaining offeror with Substantial Confidence in Past Performance and Acceptable ratings under the remaining non-cost factors.

**PRAYER FOR RELIEF**

WHEREFORE, VS2 respectfully requests that the Court enter declaratory judgment finding that the Agency's corrective action is arbitrary, capricious, and otherwise contrary to federal law. VS2 further requests that the Court enter an order permanently enjoining the award to Vectrus and directing the Agency to reinstate VS2 as the proper awardee under the terms of the Solicitation.

VS2 understands that the United States intends to voluntarily stay Vectrus' performance of the task order while this protest is pending; VS2 therefore does not anticipate requesting a temporary restraining order or preliminary injunction.

Respectfully submitted,

*Of Counsel:*
Craig Smith
Cara L. Lasley
WILEY REIN LLP

Cameron S. Hamrick
C. Peter Dungan
Roger V. Abbott
MILES & STOCKBRIDGE P.C.

Dated: March 4, 2021

s/ Paul F. Khoury
Paul F. Khoury
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
pkhoury@wiley.law
Phone: (202) 719-7346
Facsimile: (202) 719-7049

*Counsel of Record for VS2, LLC*